The first case called for oral argument is in Ray R. M. Council, whenever you're ready may proceed. Good morning. My name is Ann Hillier, and I represent the appellants in this case, Jimmy and Stella Hartwig. The Hartwigs are the foster parents of Ramel and the child at issue in this case. The appellee is Mrs. Mitchell, who is Ramel's paternal grandmother. This is an appeal from the Madison County Circuit Court's reversal of a final administrative decision by the Illinois Department of Children and Family Services, DCFS. There are two reasons that we invite a reversal of the circuit court. First, whether the circuit court correctly allowed Mrs. Mitchell to challenge DCFS's final administrative decision. You can say the department. We've all done that. The department's final administrative decision, despite her failure to follow the requirements of the administrative review law. Second, whether the circuit court correctly ruled that the final administrative decision by the department was due to the manifest weight of the evidence. The circuit court's 2007-2009 order was entered without jurisdiction and must be reversed. Jurisdiction is a question of law, and therefore the standard of review is de novo. Under Illinois law, a final administrative decision can only be reviewed under and in accordance with the administrative review law. Section 3102 states very clearly that in order to seek judicial review, the parties must satisfy the requirements of the review law. Section 3103 sets out those requirements. It states that every action shall be commenced by filing a complaint and summons within 35 days from the time of the decision. There's no dispute here that Mrs. Mitchell did not follow the requirements of the review law. What she did was file a so-called petition for administrative review in an ongoing case that had nothing to do with the administrative decision at all. In this case, DCFS... Did they file a petition or a motion? How did they caption it? The caption was petition for administrative review in an ongoing case, which was more akin to a motion, Your Honor. And no summons was issued at any time? No summons was issued properly at any time. Okay, tell me about the properly part. Well, in order to serve summons, the clerk of the court must issue summons by register or certified mail within that 35 days to each party of the administrative review. What happened here is Mrs. Mitchell filed her petition within the 35 days, but she never served summons on any of the parties. Of course, the court already had jurisdiction over all the parties in that case. In the juvenile case, correct, Your Honor. She admitted that she mailed the petition to the state's attorney and to DCFS, but never mailed a copy to the Hartwigs and never served summons on any party in that 35 days. It was February 17, 2009, which is 31 days past the 35-day time limit, that the Hartwigs found out that even this petition was filed. This was a motions hearing at the juvenile court, and at that time DCFS filed a motion to dismiss based on the jurisdiction and summons issue. The circuit court held that it was not in the best interest of the child or the grandparent to have to file a separate action. The Supreme Court of Illinois has stated that the 35-day time period to file a complaint is jurisdictional, and it cannot be waived and it cannot be circumvented. What about the summons? Well, the summons is mandatory, not jurisdictional, but again, the requirements must be met, and there is only one exception, and that's a good faith exception, that the petitioner tried to file summons or serve summons, but for some unknown reason or some reason beyond their control, they were unable to file summons. In this case, again, Mrs. Mitchell never even tried to file summons. She never even attempted. She showed up at the—her attorney showed up at the motions hearing and was pretty much like, so what? You're all here anyway. Who cares? The circuit court at that time gave Mrs. Mitchell leave to go ahead and serve summons again. This time, she mailed a copy of the petition to the Hartwiths along with the summons. Summons was not issued by the clerk and it was not sent by registered certified mail. Again, absolutely no attempt to try to meet the requirements. All of this was done within the context of the department having been named as guardian. Correct. All right. Could the circuit court have simply removed the department as guardian and made the grandmother guardian? If there was a motion at that time, yes. And circumvented all this administrative review stuff. Absolutely. And, Your Honor, also, she could have filed the complaint for administrative review in a court, and we probably wouldn't be here today if she had done that. In Lockett v. Chicago, which was overturned on another issue, the Supreme Court stated that failure to name and serve the necessary parties is a fatal defect that cannot be cured except for a good faith effort to both name and serve all parties. Here, again, she did not even mail a copy of the petition to the Hartwiths or serve summons on any of the parties. The Supreme Court in that case held that the superintendent, who was a party to the administrative review, was not named and was not served, and that the petitioner in that case did not even try to follow the requirements like this case. The Supreme Court held that it was proper to dismiss that case. The Supreme Court in that case also held that any cases, any of the appellate court cases, which have held that a failure to name and serve a party can be amended are overruled. So unless there's a good faith exception, you cannot amend or allow me to file summons again. In response, Ms. Mitchell fails to cite to any authority to support her theory that filing a petition in an ongoing case is proper. She cites to Burns v. Department of Employment Security, which states that the 35-day requirement is to hasten procedure and avoid undue delay. Mrs. Mitchell argues that if she filed in the circuit court with the judicial case, or the juvenile case, to hasten procedure and avoid undue delay. Once again, Your Honors, that didn't happen. We probably wouldn't be here today if she would have filed correctly. What Mrs. Mitchell didn't tell you about the Burns decision in her brief was that the court will only relax the requirements if there's a good faith effort shown. Mrs. Mitchell is not able to show a good faith effort. She never made any attempts to follow the requirements. The administrative review law creates the right to petition review. It establishes the procedures for that review, and it defines those limits. Mrs. Mitchell argues that there's nothing in the statute that requires her to file a separate action. She says the juvenile court already had personal jurisdiction, and it was for judicial economy that she filed in the circuit court. The very nature of Mrs. Mitchell's right to complain about the department's decision is based on following the proper procedures, and she failed to do that. Moreover, as noted earlier, Mrs. Mitchell's failure to serve summons, as required by the review law, requires the dismissal of the petition as well. The circuit court should have dismissed Mrs. Mitchell's petition because she failed to properly serve summons. She cites due process property tax, which held that the 35-day period for summons is mandatory, not jurisdictional, but the requirements must be strictly followed. Mrs. Mitchell made no attempt, much less good faith effort, to serve summons on any of the parties. At the February 17th hearing, Mrs. Mitchell was allowed to, again, serve summons a second time, and she failed to do that. She has never once, to date, made an effort to file summons properly. Mrs. Mitchell argued also that the Hartwoods waived services summons by going ahead and arguing no to the case. Well, we were already parties to the case, the Hartwoods were parties to the case before she filed the administrative review in that case, and the Hartwoods were unable, at that point, to file for special appearance. She cites, too, a lion-eye carrier for the proposition that we waive summons. In that case, the court found that because the defendant argued a substantive motion to stay and agreed to answer the complaint, the defendant waived summons. The court also said that in a case where there's no agreement to answer the complaint, then there's no waiver. Here, at the February 17th hearing, Judge Duff ordered that any party that wanted to answer the complaint had seven days to answer it. And she did not want the facts of the case, she just wanted a small legal argument. She didn't want to see the record, the administrative record. She knew the case, and she was going to decide it herself. That alone was very improper. The circuit court order basically said that the administrative law judge's conclusions as to the record were just contrary to the record. What does the record show? What does the transcript, what does the record in front of the administrative law judge show? I mean, can you argue the points that were... You know, obviously, we review the administrative law judge's decision on this, assuming that it's an administrative review. Could you argue the merits of that? Absolutely, Your Honor. The main reason, the main factor going in favor of Mrs. Mitchell was a biological factor alone. The Hartwigs had had custody of Rommel since he was two days old. And for two years, the only parents, the only mother, the only siblings he'd ever known were the Hartwigs and their children. At the hearing, Mrs. Mitchell was invited to come, but did not show up. In the order, Judge Dust says that she wasn't invited. I don't know where she got that information. Again, information outside the record, but she was invited and she did not come. The Hartwigs testified and DCFS employees testified. And there was a lot of things that upset the ALJ, things like there was smoking in Mitchell's home. Mrs. Mitchell missed a lot of appointments, health care appointments for Rommel. She wouldn't keep track of what was going on for the other caregivers. When Rommel would go to Mrs. Mitchell's home and there was some, a lot of times the occupational therapist or speech therapist would come to the house, she wouldn't write that stuff down. She wouldn't write the type of things that Rommel was going through so that Mrs. Hartwig would know when Rommel came back. One of the more shocking things was that DCFS didn't know at the time, that came out in the hearing was that Mrs. Mitchell allowed her son, which is Rommel's father, to stay in the house with her minor granddaughters after her son had been arrested in that same home for having sex with a 12-year-old. Drugs, pornography, everything else. The DCFS employees at the administrative hearing had great cause with that. They said that it would definitely cause them concern to have known that fact before they had decided to place Rommel with Mrs. Mitchell. The only thing that favored Mrs. Mitchell was a biological relationship. Everything else, even the, they didn't do a bonding assessment. The DCFS employees said that if they had done a bonding assessment, it would undoubtedly have shown that it favored Stella Hartwig as the only mother that Rommel has ever known. The ALJ was very thorough in the findings of facts and conclusions of law. The fact, she testified to every fact in the hearing. She took all the evidence from every witness into account and found that transfer of custody to Rommel was, to Mrs. Mitchell's home was not in Rommel's best interest. And the director of DCFS agreed. Now, Illinois courts have held that a biological relationship alone cannot outweigh the other best interest factors when factors favor a non-biological parent. The standard of review in this situation is manifest weight of the evidence. If anything in the record fairly supports the administrative agency's decision, then the decision is not against the manifest weight. A reviewing court cannot reverse administrative findings based on mere facts and an opposite conclusion is readily apparent or that the reviewing court might have ruled differently. That's what Judge Duff did. She thought better of it. She had knowledge outside of the record and used that knowledge to overrule the ALJ and DCFS director. Mrs. Mitchell's argument would have this court ignore the final decision of the director of DCFS and instead defer to individual assessments of DCFS employees. Employees who DCFS later determined had given too much emphasis to the biological relationship, employees who testified that the bonding assessment was unnecessary because it favored Stella Hartwig, and employees who admitted that had they known that Rommel's father was staying in the home would have had great concern in placing Rommel with Mrs. Mitchell. Mrs. Mitchell argues that this court should ignore the teachings of Ashley and Violetta because independent experts' medical testimony was not proffered in favor of Rommel's placement with the Hartwigs. That argument is unfounded. According to NRA's CV, Ashley and Violetta were correctly decided. The issue in CV was the circuit court's over-reliance on unrefined expert opinions. NRA's CV teaches that expert opinions are merely only one factor in the best interest factors. Yet the circuit court in this case made the same mistake as the court in CV. It placed undue emphasis on expert opinions and undue weight to a single factor, the biological relationship. In NRA Violetta and NRA Ashley, the court reversed the circuit court's placement of a child with a biological relative over the foster parents. It's two cases just like this case where a child was being sought by the foster parents and a relative. The court went with the foster parents because, again, the biological factor is only one factor. In all these cases, like this case, the child was very young, days old, when the foster parents had the child. The child was with the foster parents years, like this case. One of the key factors in both of the cases was the bonding issue, again, which favors Ramel being placed with the Hartwicks in this case. The circuit court in this case not only substituted her own judgment for that of the ALJ and director, but also used facts outside the record to overrule the case. For instance, in the July 7, 2009 order, the circuit court stated, the Mitchells were not heard nor were they given an opportunity to respond to the one-sided any windows presented by the Hartwicks. As I stated earlier, that is not a fact that was in the administrative record. In fact, there was no testimony at all that said that Mrs. Mitchell was not invited to the administrative hearing. Your Honor, under these circumstances, the circuit court's July 7 order must be reversed and the department's final decision implemented, returning placement of Ramel to the Hartwick home immediately. Any more questions? Where is the child now? The child is with the Mitchells right now. Anyone else? Thank you. Thank you. Thank you, counsel. Counsel? Counsel, how are you finding jurisdiction? Judge, actually, we had filed in the JA case because we thought that since they were all parties to the case, that it would be more proper. They were already deciding the best interest of the child in that case, so it would be proper to file the petition in the JA case. And we did file it within 21 days after the finding came down. So we were well within the 35-day period. It was 21 days later. And we believe that the court did have jurisdiction over the parties already. I do disagree with some of the arguments that the appellant has. We had filed a petition for guardianship as well in a probate case. The judge dismissed that petition. So there was that petition filed the same day the petition for administrative review was filed. The statute requires us to file a complaint. A petition for administrative review is a complaint. It doesn't say we have to file a complaint in a new cause number. And usually where for judicial economy and to avoid duplicate litigation, the courts would want us to file it in a case that's already determined, a transaction that arose out of the birth of this child out of his best interest. I mean, it's the same. They're deciding the same thing, and that's where we found jurisdiction. Could you have filed an action, a complaint for administrative review, and simultaneously request consolidation of the cases? We did, Judge. That's exactly what we did. We requested consolidation of the cases. But you said you filed it in the juvenile action. We filed it in the juvenile action. Oh, I'm sorry. We filed a probate case, and we requested consolidation. But you filed the complaint for administrative review in the juvenile action. That is correct. Let me ask you also the same question I asked the other counsel. I mean, you could have simply requested that the court remove the department as the guardian and have your client named guardian in the juvenile case. That is correct, Judge, but she had exhausted all her remedies with the administrative review. My client did not actually get petition for leave to intervene until November of 2008. The child was born in June of 2007. I have the paternal grandmother. She did not know that this child existed until October of 2007. Attorney's test results were not conclusive until November. I'm not talking about earlier. I mean, just because the department was previously named guardian doesn't mean they have to stay guardian throughout the case. Doesn't the circuit court have the authority to remove them as guardian and make a relative guardian? Absolutely, Judge. At this point in the case that the father was still working his service plan, to this date the father's rights haven't been terminated. So the father's still working his service plan, and this court decision may be devastating to a child who's been placed with the Mitchells since August of 2009, and then in a couple of months from now the circuit court can turn around and give the father custody again. So it would basically displace the child from the grandparents back to the Hartwicks, only for the trial court to say the father's rights aren't terminated and it's returned home. The goal is still to return home. And I believe maybe that is why we didn't petition for custody, because the father's rights had not been terminated. And that was, in a sense, why we filed a probate action, which the judge actually dismissed. We did serve summons. We actually gave a certification of service to DCFS on the petition for administrative review and also to the state's attorney. The Hartwicks were intervening petitioners, and they were not interested in the service. And I know that she says on February 17th that no one knew, that we just waltzed in and said, so what? That's not true at all, because DCFS, the attorney general had already filed a motion to dismiss prior to the February 17th date, which was taken up on the February 17th date. So I didn't just walk in with a petition for administrative review and say, okay, you guys are all here. But at that time, I would note that the Hartwicks took part in the proceedings. Once that petition was filed, they didn't file a motion to dismiss. They actually took part in the proceedings on February 17th. There was an actual summons issued by registered mail. It is in the file. It was file stamped by the Madison County Court on February 24th. And, yes, that was 43 days later. However, as I said, DCFS was well aware that we had filed a petition for administrative review on January 7th, 2009. And I did cite Brazos v. Property Tax Appeal Board that improper service of summons doesn't deprive the court of jurisdiction. It's mandatory, not jurisdictional. And the litigant should be permitted to offer any competent evidence to show that summons was issued. And summons was served. And actually, on the motion of dismissal, there is no affidavit from DCFS or the Attorney General that they didn't receive the summons. And I believe that's their burden. It's their motion. It's their burden. There's no affidavit on file from the Hartwicks that they didn't receive the summons. And I believe that's their burden. And they didn't file a motion to dismiss based on that issue. And Peacock v. Illinois Property Tax Appeal Board. It's a 2003 Fourth District case. All the defendants had already made general appearances. So the court had – and they had participated in the merits. The Hartwicks participated in the merits. So they waived jurisdiction. Also, Illinois Carrier v. ICC. The defendants, an agency, and the ICC agreed to a briefing schedule. On February 17th, as we sat in Judge Chambers, all three of us, the Hartwick Attorney General and I, had agreed to brief this within seven days. So – Well, do you agree with the proposition that parties, by their subsequent actions, could waive any defects in the service of process that jurisdiction cannot be waived by any party? I do agree with that, Judge. I do agree with that. Although I feel that the court already had jurisdiction. And furthermore, in Burns v. Department of Employment Security, the purpose of that 35-day period to file the complaint, you know, giving the court jurisdiction, and also is basically to avoid unnecessary delay. I don't know how we could have been any quicker. We filed it within 21 days with the court. Had the court said, you know, you can't file in this case, we would have filed it – we would have filed an MR case. I mean, I don't think that the actual case number had anything to do with the petition for administrative review. I think the administrative hearing is what was important, and it was against the manifest weight of the evidence. Well, since you brought up the administrative hearing, let me ask a question about that. The circuit court's order basically says that the findings and the basis for findings of the administrative law judge didn't exist in the record. That it was contrary to the record, and that the circuit court's findings were actually reflective of the record. There's, you know, a real clash, a contradiction in the tone of the substance of the two orders. Could you address that as far as the circuit court's findings overruling that, and the basis in the record for the administrative law judge's findings? I can't. I agree with the appellants that the standard review is against the manifest weight of the evidence. Also, I cited Lyon v. DCFS, which is a Supreme Court case, which states that the finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident, or when it is unreasonable, arbitrary, and not based upon any of the evidence. I believe, and the appellee believes, that this is unreasonable, arbitrary, and not based on any of the evidence. And looking at the administrative record, just solely looking at that, only two people testified on behalf of the Hartwigs that day, Mrs. Hartwig and Mr. Hartwig. Mrs. Hartwig herself testified that it was not in the child's best interest that they break off a relationship with the grandparents. She testified that Mrs. Mitchell was a good person, and she loved her kids. She never denied that they had a bond with the child. She testified that Mrs. Mitchell, the appellee's husband, had a good relationship with the child. She testified that she took the child in as a birth control method for her other three children that she's adopted. She testified that she thought he began to bond on the second day that she had him, but then she testified later that people can't bond in one day. She testified all three of her other children were ADHD. When she was asked specific questions about Mrs. Mitchell and Mrs. Mitchell's responsibilities about getting the child therapy, she said, I quote, I have no idea if he's getting the therapy. She also, when she was asked if she agreed that Mrs. Mitchell would do whatever was necessary to keep the child medically safe, she said if it's in the placement review summary, then yes, I would agree with that. Mr. Hartwig's testimony was very brief. I think he testified that the child had grown on him. So then three other people testified on behalf of the Mitchells. And contrary to what the appellant says, my client was not a party to the administrative hearing. She was not invited to the administrative hearing. She had not petitioned for leave to intervene until November, and that wasn't heard until February 17th, her petition for leave to intervene. So she was not a party to the administrative hearing, and she was not invited. But three people on behalf of DCFS came in and testified on behalf of the Mitchells. Cynthia Lawley, she's a supervisor of Madison County Placement. She's been there for over 30 years. She testified that therapists told her things were going well with the Mitchells. She testified that she had talked to a caseworker. The caseworker told her the child was content going to people at the Mitchells for affection, getting affection. He was settled in, and she also testified the child could rebond. She had 30 years of experience with DCFS. Trish Hammond, southern regional clinical services coordinator and a part-time sexual abuse service coordinator, has more than 17 years with DCFS. She was asked if the Mitchells expressed interest in the custody of Rommel immediately, and her response was yes, they did. She was asked if the department followed the procedures in placing the child with the Mitchells, and she said yes, they did. Her recommendation was that the child live with the Mitchells, and that the goal was still to return home. She stated she believed that the placement with the Mitchells was in the child's best interest, and there was an expectation that he could rebond with the Mitchells. She stated any issues that the Hartwicks had brought up at the hearing were addressed by the department, including the issues about the Mitchells' son, that a nursing referral and home study had been done at the Mitchells' home. She stated that there were no convictions against the father, that they were only charges, and she knew that the father had been moved out of the Mitchells' home. She testified to that. She said there was no reason he couldn't be placed with his family, and that their whole goal was to reunify families. And then the only other person that testified, Daniel Davis, a DCFS Southern Regional Clinical Manager, with over 20 years' experience with DCFS. He told, I believe, the appellate's attorney, that the issue was to place the child either with the grandparents or with the foster parents. The issue wasn't whether to place the child with the father, and he thought it was in the child's best interest that he be with extended family so he can develop bonding and linkage. There was no bonding assessment done. The ALJ relied on this questionable bonding assessment that was never done. He also testified children always go back to their roots. He said it was of the utmost importance that the child not lose the connectedness of his roots. He also said that they follow statute in their decision. So what I mean by administrative hearing being, or administrative law judge's decision being against the manifest weight of evidence, you had 67 years of experience of DCFS testifying that this child should be placed with the Mitchells, and the ALJ turns around and places him with the Hartwigs, who are the only two people that are testifying on their behalf. The director of DCFS ratified the ALJ decision, is that correct? He did. He did not testify at the hearing, of course. No, I realize that, but I mean as another step in the remedies, the tier of remedies, he did ratify it, is that correct? That is correct. Let me make sure I understand the circumstances as far as the facts. There has been a dispositional order entered, is that correct? Correct, Judge. And the dispositional order has placed guardianship in the agency, DCFS? Yes. And when was that in the context of all these administrative proceedings? Actually, Judge, we had filed a motion to dismiss in this case because the notice of hearing was on July 20th. The dispositional hearing was not had until August 11th of 2009. Okay, so that was after the administrative decision? Correct. So at that point the child had been on a temporary placement with DCFS? Correct. And with placement, actually at the time this all started. Temporary guardianship. Right. The child did not live in the Hartwigs' home for two years of his life. I believe in March of 2008 the child was going back and forth when a visitation schedule was set up by the court in the J.A. case. It was set up so the child would spend three days, I believe it was three days with the Mitchells and three days with the Hartwigs. So this child has been going back and forth until August of 2009. There was an emergency removal, though, of the child early on in placement with DCFS and DCFS has had guardianship since then. Correct. Is that right? I believe he was born cocaine exposed and to the mother. The mother never tried to work a service plan and she was found unfit. Okay. And the father is still working a service plan. Okay. The appellant also argues that the primary bond is with Ms. Hartwig. There's no bonding assessment then. So, I mean, that's speculative. And I believe the ALJ based part of her decision on that, that the bonding assessment would have favored the Hartwigs. Well, it wasn't one done. The ALJ also based her decision on it if the dad's rights were terminated. Well, here we are. It's 2010. Dad's rights still aren't terminated. She also based her decision on if the goal was for adoption. The goal has not been for adoption ever in this case. It's been to return home every step of the way. And the 67 years of experience that testified at this trial told the ALJ repeatedly over and over the goal is to return home. So, I believe the ALJ was speculating and her decision was against the weight of the evidence. The appellant also wants us to say that, you know, the primary bond is more important. The only reason to place this child with the Mitchells is because they're relatives. They have the biological factor. Well, no one factor is dispositive. And N. Ray, Austin, W. And that's a Fifth District case, 2005. Supreme Court took it. But they said no one factor is dispositive. So, you have to look at all the factors. So, if you look at all the factors, and I just want the court to note that primary bonding is not one of the factors in placing a child. But development of a child's identity is one of the factors. Background and ties, familial, cultural, and religious are one of the factors. The need for permanence, need for stability, continuity of relationships with parents, siblings, and other relatives. Those are three of the factors that are in the factors that are supposed to be looked at in the best interest of placement of a child. And all of those, the child gets from the biological family. You know, appellants arguing, yes, I have the primary bond. Well, we have the biological relationship. But we also have other factors on our side. The appellants also argue that the department can only change the placement of substitute care for a reason. But in Austin W., which is the Supreme Court case through the 5th District, the Supreme Court said it doesn't have to be a change. That the best interests of a child are paramount. That that's all that matters. And we agree with the appellant that by 11E says the best interests are paramount, even if over the family. And we would agree with that. But all we're saying is that when the ALJ heard the evidence, it was all in favor of the Mitchells and not in favor of the Hartwigs. So her decision was unreasonable, arbitrary, and it was not based on any of the evidence that she heard. The appellant also relies on Ashley Kay, which has the best interests of the child are paramount. We agree. But what we're saying, Your Honors, is that the best interests of this child is that he be placed with the Mitchells. And, Judge, since you brought up the motion to dismiss, I just want to say that we did file that on August 3rd with this court. You indicated that it would be taken up with the case. That's correct. And on July 20th, they filed a notice of appeal. The dispositional hearing was had on August 11th. In re genera te, a 2006 First District case, an adjudicatory order is not final and appealable. Rather, only a dispositional order is final and appealable. As I said, to the state, the father's rights have been terminated by the circuit court. And placing this child with the foster parents after nine months of no contact would be devastating, especially since he's working the service plan. Also at the administrative hearing, there was no evidence, no experts there that said there wasn't a bond between the child and the Mitchells. There was no evidence of any inability of the Mitchells to care for the child. No evidence that placement with the Mitchells was not in the child's best interest. And there was no evidence that the Mitchells weren't cooperating with the child's therapist or doctors. There was no reason for the ALJ to go against her own department, basically, and put this child with the Hartwicks. And since the appellant, she cites Enri, Violetta B, the First District case. That case, actually, there were three people, a family therapist, a psychiatrist, and a social worker that testified for the foster parents. Thank you, counsel.  Thank you, Your Honor. I'd just quickly like to talk to you about the motion to dismiss. Once again, if Mrs. Mitchell would have filed the administrative decision, as she should have in a case on its own, the final administrative decision would have been in appealable order. Because she files it in a juvenile case that's still ongoing, she wants to argue now that the decision by the circuit court regarding this administrative decision is not a final appealable order. She can't have it both ways. She wants to file in a case that already has jurisdiction over the parties. Nobody else can do that. I can't go and file in a case that's already going on with somebody else because the court already has jurisdiction over those people. That's just not the way the procedure goes. In Illinois, the courts have concluded, as I'm sure this court will conclude, that petitioners are not allowed to make their own rules of procedure. The final administrative decision in this case was a final appealable order. In addition, Your Honors, Mrs. Mitchell's attorney spent a lot of time pulling out sentences from the administrative review from the ALJ and the findings that she made. She went over and over about Hammond and Lawley and Davis and how their testimony was for the Mitchells. But when those same witnesses, who were DCFS employees and had to be at the hearing, they weren't there just for the Mitchells, they had to be there, they said a lot of good things about the Hartwigs too, which she doesn't tell you. They were unbelievable foster parents. They've never had any problems with them. There's absolutely no problem with the custody remaining with the Hartwigs. And Mr. Davis is the one that said that the bonding assessment wasn't necessary because undoubtedly Mrs. Rommel had bonded with Mrs. Hartwig as the only caregiver he had ever known. So, you know, she uses some statements as credible statements, but the other things that say good about the Hartwigs, well, forget about those. You know, this is one of those cases where, yes, Mrs. Hartwig is a very wonderful lady, and she said, yes, Mrs. Mitchell should be allowed to be a grandparent in this child's life. I will allow that under my conditions. The child shouldn't be there where a convicted sexual offender is living who sexually offended the girls in her home, Mrs. Mitchell's home. So, yeah, there's a lot of going both ways. But the circuit court can't say, well, the Mitchells were also good providers. That's not the test. The test is, is that the only decision that makes sense here? In addition, Your Honors, the Hartwigs, even though it's not part of the evaluation of the jurisdiction and summons issue, they suffered a lot of prejudice in this case. First, they did not have the chance to have a judge with a fresh view of the case. Judge Duff said on the record, you'll see in the transcript, that she did not even want a copy of the administrative record because she knew the case well enough to decide it herself. She did not look at what happened. She used her own knowledge outside the record to decide this case. There are so many times that she did that with her order. I could not sit here. I don't have time today to tell you all the information she used on her own. See, what you're saying, this really was not an administrative review. Absolutely not. It was just a new hearing for who should have the child. Exactly, Your Honor. Thank you. A custody hearing. Exactly. And that's not the established route for her or anybody. I would just also like to say that the ALJ and the director, I found out before I came here, that the ALJ has 22 years' experience and the director has 26 years' experience. Even though they don't have the 60 years' experience of the employees, they are an ALJ and a director and have been with DCFS for over 20 years each. Again, Mrs. Mitchell's attorney sits here and, again, goes outside the record saying that the Mitchells were not invited. DCFS employee Cindy Lawley said that the Mitchells were invited but decided not to come. That is in the administrative record. Whatever other information they think they have is outside the record and cannot be considered. What do you mean invited to the administrative review? Aren't there some actual notice requirements or something? Well, actually, no. Did they get formal notice? I don't know, Your Honor. All I know is what Cindy Lawley said and that's what's in the record. Okay. Beyond that, nobody said anything. She's the caseworker. She's the one dealing with the Mitchells. That's all we can go by. Again, Your Honor, I would just like to say that the Hartwigs have done everything right. They have done it again. Thank you, Your Honor. Thank you, counsel. We appreciate the briefs and arguments of counsel and we will take this case under advice.